# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs in Knoxville July 21, 2015

### STATE OF TENNESSEE v. LUIS JORGE DIAZ

**Appeal from the Criminal Court for Davidson County**
**No. 2012B1673     J. Randall Wyatt, Jr., Judge**

_____

### No. M2014-01685-CCA-R3-CD – Filed September 18, 2015

_____

Appellant, Luis Jorge Diaz, was convicted of six counts of aggravated sexual battery. The trial court sentenced appellant to ten years for each conviction and aligned two of the convictions consecutively, for a total effective sentence of twenty years. Appellant now challenges his convictions, arguing that: (1) the evidence was insufficient to support his convictions; (2) the trial court erred in allowing the State to use leading questions during the State's direct examination of the victim; and (3) the trial court erred in sentencing. Following our review of the briefs, the parties' arguments, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

ROGER A. PAGE, J., delivered the opinion of the Court, in which CAMILLE R. MCMULLEN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Joshua L. Brand (on appeal), Nashville, Tennessee; and Paul J. Walwyn (at trial), Madison, Tennessee, for the Appellant, Luis Jorge Diaz.

Herbert H. Slatery III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Victor S. Johnson III, District Attorney General; and Sharon Reddick and Kristin Elizabeth Menke, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

This case concerns a stepfather's intimate touching of his six-year-old step-daughter. As a result of this behavior, appellant was indicted for five counts of aggravated sexual battery and one count of rape of a child. The rape of a child indictment

was amended to aggravated sexual battery. Appellant's trial began on October 7, 2013, and he was convicted of all six counts of aggravated sexual battery.

## I. Facts

Angela,[1] the victim's grandmother, listed each of her daughter's thirteen children by name and age and stated that she had aided her daughter, Carrie, in the children's care by allowing the family to live with her periodically and by paying for clothing, school supplies, and various bills. Angela explained that appellant and Carrie met in 2008 and that appellant, Carrie, and three of the children, including the victim, stayed with her from May 1, 2010 to July 8, 2010. During the family's stay, Angela observed that appellant interacted "pretty well" with the children but that appellant focused most of his attention on the victim. The three children slept in the same room as appellant and Carrie when they stayed in Angela's home. Angela explained that when appellant and Carrie began their relationship, six of Carrie's sons lived with a family friend, Ms. Irene Reed, who adopted one of the sons, and that this arrangement was mainly due to Carrie's lack of housing or a job. However, Ms. Reed returned three of Carrie's sons — Jake, Nicolas, and Carlos — while the family was living with Angela in 2010. Each of these sons was under the age of eighteen at the time.

After the family moved out of Angela's home, Angela continued to notice that appellant seemed "really obsessed" with the victim. Appellant limited the victim's activities with other people, including Angela and the victim's brothers. Angela explained that she became concerned when she discovered that appellant bathed the female children and that Carrie bathed the male children and that this routine was still occurring when the victim was six years old. Angela described the family's nomadic living situation, in which the family moved from her home, to apartments, to the home of appellant's mother, sometimes leaving one or more of the older boys with Angela. Angela described one of the apartments in which the family resided, stating that the apartment had two bedrooms and that appellant, Carrie, and the younger children slept in one bedroom and the older boys slept in the other bedroom. After living in this apartment, Carrie and the children again moved in with Angela around Halloween 2011, but Angela did not allow appellant to live in her home. After the family moved in with her and while Angela was out of town, one of the older sons called Angela and told her that the victim had made allegations of sexual abuse against appellant. When Angela returned home, Carrie and the younger children, including the victim, were gone. Angela discovered that appellant had also left with Carrie. A day or two later, the victim called Angela and told Angela that she was going to Mexico to visit her biological father.

_____

[1] It is the policy of this court to protect the identity of minors who were the victims of sexual crimes; as such, we will refer to the victim as "the victim" and will refer to her immediate family members by their first names only. In doing so, we mean no disrespect.

However, a couple of days later, Carrie called Angela and told her that she was lost. Along her drive, Carrie saw signs for Illinois, Indiana, and Kentucky. Eventually, the family returned to Angela's home, and Carrie made an official report concerning the victim's allegations. Angela recalled that during the investigation of the child abuse, appellant called and told her that "things" were occurring in her home and that if she knew about them, she would evict Carrie and her family; however, appellant did not elaborate on this statement. Angela also testified that during the investigation, Carrie continued to allow appellant to be near the victim, specifically describing three separate instances in which the victim and appellant were in contact. As a result of this contact, the seven children that were residing with Carrie were placed in Angela's custody. At the time of trial, Angela shared custody of the four smaller children with Carrie and the older boys were in Carrie's custody. However, Carlos, one of the victim's brothers, still resided with Angela.

During cross-examination, Angela testified that when the older boys initially started living with Carrie and appellant, the boys interacted well with appellant but that the relationship later deteriorated after appellant refused to allow the victim to play with her older brothers. Angela specifically recounted one instance of appellant's discipline of the victim, explaining that the victim had gone to the mall with Angela after the victim told appellant and Carrie that she did not want to go to the store with them. The next day Angela returned home to find the victim crying because appellant had taken three of her siblings to the park and to get candy but had told the victim that she was not allowed to go because she had not gone with him the prior day.

The victim testified that she was eight years old at the time of trial and that she was in the third grade in school. The victim identified appellant and explained that when he lived with her, she referred to him as "Daddy," although she knew that appellant was only her younger brother Joseph's biological father. The victim testified that the incidents in question occurred at the family's old apartment and at Angela's house.

Regarding the incidents that occurred in the apartment, the victim explained that she, appellant, Carrie, and three of her siblings slept in one bedroom together. Carrie and the three siblings shared the bed while appellant and the victim slept on the floor. The victim described one instance in which she and appellant were sleeping on the floor and appellant turned her to face him and began pushing his genitalia against the victim's genitalia "really hard." When asked if appellant's body was staying still or moving when it was pushed against her, the victim stated that appellant's body was moving, although she was unable to describe the movement. Both the victim and appellant were clothed during this encounter. The victim described another incident that occurred in the bedroom in the apartment while appellant and the victim lay in the floor, stating that appellant grabbed her hand, placed her hand on his unclothed penis, left his hand resting over her hand, and counted to ten or twenty while making her hand "go up and down."

The victim stated that during this occurrence, she felt "something wet" while her hand was on appellant's genitalia. The victim also recounted a third incident in which she awoke with her hand in appellant's pants touching appellant's penis, and the victim felt "something wet." The victim explained another encounter that occurred in the living room of the apartment in which appellant lay on the couch behind the victim and removed her pants and underwear. Appellant then touched the "outside" of the victim's genitalia with the tips of his fingers. The victim also recounted another occurrence in the kitchen of the apartment in which appellant picked the victim up and sat her on the counter while standing in front of her. However, the victim could not recall what occurred next. The victim also remembered appellant's asking her to touch his testicles while they were in the bedroom of the apartment, although she could not remember the other surrounding circumstances of the incident.

Regarding the incident that occurred in Angela's home, the victim testified that appellant retrieved a glass of milk and then took the victim to the bathroom, locking the door after they had entered. Appellant then sat on the toilet, pulled down his pants, drank some of his milk, and then moved his hand "up and down" on his "private." Appellant then grabbed the victim's hand and "[did] the same thing and milk came out of his private." The victim explained that she had to wash her hands afterward to remove the liquid.

The victim testified that after these incidents, she told her mother and grandmother about the encounters with appellant. The victim explained that sometime after she told her mother about the sexual abuse, Carrie took her to talk to appellant. During the conversation, Carrie questioned appellant about the victim's accusations, and appellant responded that he was asleep during the incidents. The victim stated that if not for the abuse, she would have liked living with appellant and asserted that her brothers had not asked her to make false allegations against appellant.

During cross-examination, the victim recalled that she once played a game with her older brothers and that appellant became angry. The victim testified that she slept on the floor of the bedroom because there was insufficient space to sleep on the bed with her siblings. The victim asserted that she never heard her older brothers threaten appellant.

Carlos, one of the victim's older brothers, testified that he was fifteen at the time of trial. He stated that the summer prior to trial, he and his brother Nicholas had been charged with robbery and that he had pleaded guilty in juvenile court and was on probation. Carlos explained that he had known appellant for about five years and that he met appellant while he was living with Ms. Reed. However, he did not get to know appellant until he moved into Angela's home while appellant, Carrie, and some of his siblings were residing there. Carlos testified that he initially liked appellant and that appellant seemed to treat his siblings "[p]retty well." However, over time, Carlos

-4-

observed that appellant began "bonding" more with the victim than with the other children. During that time, appellant began ignoring Carlos and his older brothers and then, eventually, began telling Carrie that her teenage sons were too old to hug her. Appellant also accused Nicolas of looking down his mother's shirt. Appellant told the victim that she could not hug or play with her older brothers.

Carlos described an incident that occurred on Halloween 2011, when he was thirteen years old, explaining that at the time, he, his mother, and the four young children were living with Angela but that appellant was residing elsewhere. He, Carrie, and the four younger children went to the home of appellant's mother to retrieve appellant so that appellant could accompany them trick-or-treating. When they arrived, Carlos went trick-or-treating at the surrounding apartments, and when he returned to appellant's mother's home, Carrie and appellant were arguing in the front yard while the younger children stood nearby. Carlos heard appellant ask why Carrie had brought "that [expletive]," referring to Carlos, with her, and Carrie slapped appellant. Carlos testified that appellant's mother got involved in the argument and that appellant pinned Carrie against the car and began choking her. Carlos testified that he pulled appellant away from his mother, but appellant's adult brother, who had been videotaping the incident, intervened. Thereafter, appellant and his brother began hitting Carlos while appellant's other two brothers, who were also adults, began hitting Carrie and "pulling her hair out." Carlos explained that the fight continued until a group of unknown men got out of a car and intervened. After the fight ended, Carlos, his mother, appellant, and the younger children got in the car and left. Carrie drove her children home, dropped them off, and then left with appellant. A couple of weeks after this incident, Carlos learned that the victim had made allegations of sexual abuse against appellant. Carlos remembered that one of his brothers informed their grandmother of the allegations and that he believed it was important to tell their grandmother because he did not believe that their mother would take further action. Carlos denied telling his sister to make up these allegations.

During cross-examination, Carlos testified that he and his brothers returned to live with his mother of their own volition. Carlos explained that the four younger children always slept in a room with Carrie and appellant. Carlos explained that any time there was an argument around appellant's family members, the family members would record the argument using their cellular telephones.

Nicholas, the victim's older brother, testified that he was sixteen at the time of trial and that the previous summer he had pleaded guilty to aggravated robbery. Nicholas's testimony was substantially similar to Carlos's testimony. Nicholas added that he moved back from Alabama so that he could be with his mother. Nicholas explained that around 2011, he moved with his mother and appellant to the home of appellant's mother because he wanted to stay with his mother. Nicholas stated that initially he got along well with appellant but that over time, his opinion of appellant changed because appellant became

-5-

controlling of Carrie and the younger children, explaining that appellant did not want Nicholas and his mother to hug or want the younger children to play with him. Nicholas explained that he became concerned by appellant's giving the victim baths while the door to the bathroom was locked. Nicholas also recalled an incident in which appellant accused Nicholas of looking down his mother's shirt, which Nicholas denied doing. Nicholas testified that other than the above behaviors, he never saw appellant inappropriately touch the victim. During cross-examination, Nicholas stated that he never had any serious conflict with appellant prior to the victim's allegations. Nicholas also acknowledged that in addition to his aggravated robbery conviction he also had a conviction for felony vandalism.

Jake, the victim's older brother, testified that he was eighteen years old at the time of trial. Jake's testimony was substantially similar to the testimony of Carlos and Nicholas. Jake added that after he found out about the victim's allegations, he called his grandmother and informed her about the abuse. Jake denied telling the victim to make false allegations against appellant.

Jill Howlett testified that she worked as a social worker for Our Kids Center, an outpatient clinic that conducts forensic medical examinations of children when allegations of sexual abuse are made. Her primary responsibility was to collect information about the child's medical and social history from the child. Ms. Howlett explained that the information she collects is used to determine which tests the medical professionals should conduct and how the tests are performed. Ms. Howlett testified that she interviewed the victim in December 2011. Using the report generated immediately after the interview, Ms. Howlett stated that the victim had just turned seven shortly before the interview. Ms. Howlett testified that during the interview, the victim stated that appellant touched her genital area and behind with his "private part" on multiple occasions and that the contact occurred "over her clothes." The victim also told Ms. Howlett that on one occasion, appellant touched the inside of her genital area with his fingers. The victim also reported that appellant had put her hand on his penis and "moved it back and forth" and that appellant made her "squeeze" his testicles while appellant held his penis. The victim told Ms. Howlett that appellant made her hug and kiss him every morning and night and that appellant would lick her teeth when she kissed him. Ms. Howlett testified that this information was given to the medical personnel that examined the victim following the interview.

Lori Littrell, a physician's assistant at Our Kids Center, testified that prior to a physical examination, she interviews a child's caregiver and a social worker interviews the child to receive information about the child's medical history and presenting history. Ms. Littrell explained that this information helps determine the extent of the physical examination. Ms. Littrell testified that she examined the victim in December 2011. Using the report generated immediately after the examination, Ms. Littrell explained that the

victim's examination was normal. However, Ms. Littrell testified that normal results were not unexpected given the length of time since the victim's last contact with appellant — three to four weeks prior to the examination — and the type of contact that the victim described, which Ms. Littrell explained was unlikely to cause physical injury. Ms. Littrell also agreed that injuries to the genital area heal very quickly. During cross-examination, Ms. Littrell agreed that the results from the victim's physical examination neither proved nor disproved that the victim suffered sexual abuse.

Metro Nashville Police Detective John Ferrell testified that he and another detective worked on this case and that he was present for appellant's interview. The State introduced a video of appellant's interview into evidence and played the video for the jury. During the interview, appellant stated that he had a good relationship with his family until his wife's three older sons moved in with them. Appellant explained that after the three sons moved in, the boys exposed the younger children to sexually explicit information and left condoms in plain view throughout the house. Appellant alternatively either stated or implied that the victim's allegations were a product of: (1) the victim's brothers' influence; (2) Carrie's anger in response to appellant's telling her that their relationship was over; and (3) the victim's anger towards him in response to the fight that occurred between appellant, Carrie, and Carlos on Halloween 2011. Appellant also alleged that while the boys were living in Alabama, the boys were involved with allegations of sexual abuse, which were investigated by the Alabama police. After the video was played, Detective Ferrell testified that appellant's assertions that some of the older boys were involved with allegations of sexual abuse while they were in Alabama did not prove true after officers contacted Alabama law enforcement and children's services. Detective Ferrell explained that after appellant's initial interview, appellant contacted law enforcement alleging that he had Carrie's cellular telephone and that he had discovered that Carrie had been sending nude pictures of herself to other men. He did not allege that the victim had seen these pictures.

During cross-examination, in response to defense counsel's question asking what appellant could have done during the interview to change Detective Ferrell's opinion that appellant was guilty, Detective Ferrell stated that appellant's reactions would have had to have been different. Detective Ferrell stated that appellant was "stoic" during the interview and that he would expect an innocent person to be on the "very borderline of aggressive" in an attempt to convince the detectives of innocence; however, Detective Ferrell conceded that different people react differently. Detective Ferrell stated that he did not investigate the Alabama incidents but that he assumed the other investigating detective found nothing because there was no information about the incidents in the case file.

Following this testimony, the State made the following election of offenses: Count One, aggravated sexual battery, appellant pressed his private parts against her private

parts "really hard" while lying on the floor of the bedroom; Count Two, aggravated sexual battery, appellant put the victim's hand on his private area and made her hand "go up and down" as he "counted to 10 or 20" while lying on the floor of the bedroom; Count Three, aggravated sexual battery, the victim awoke to find that appellant had placed her hand in his pants, touching his private area, and she felt something wet; Count Four, aggravated sexual battery, appellant put the victim's hand on his unclothed private area after drinking milk and moved her hand "up and down until 'the milk came out'"; Count Five, aggravated sexual battery, appellant made the victim "touch and squeeze his testicles" in the bedroom; Count Six, aggravated sexual battery, appellant touched the victim's private area "with the 'tips of his fingers' on the skin." The State then rested its case-in-chief.

Appellant called Carrie, the victim's mother, to testify in his defense. Carrie testified that she was appellant's wife and that she and appellant married in 2008. Carrie testified that she met appellant at Krystal, a fast food restaurant, where both she and appellant worked. Carrie explained that the first year of their marriage was good but that eventually appellant became controlling of her and the victim, refusing to allow the victim to visit a friend's house and protesting Carrie's or the victim's visiting Carrie's mother. She further explained that appellant did not want any of the children to be around her family members. Carrie explained that appellant did not like her older children and that she and appellant's relationship suffered as a result. Due to the ensuing arguments, appellant moved in with his mother while Carrie and her children moved in with her mother. Two weeks after the separation, the victim began telling Carrie about the incidents with appellant. Carrie explained that over several days, the victim told her small parts of what occurred. When Carrie asked the victim why she had not told Carrie sooner, the victim explained that appellant had told her that if she told anyone he would find out. The victim also told Carrie that she was afraid that Carrie would be angry with her. Carrie testified that even after the victim made allegations against appellant, Carrie continued to talk to and see appellant, even taking the children and appellant with her to see the holiday lights at Opryland Hotel. Carrie admitted that she also wrote appellant letters while he was in jail. Carrie explained that appellant asked her to write a letter saying that the victim had lied in making the allegations against him. Defense counsel entered a letter into evidence in which Carrie wrote, "[P]lease forgive me[.] [M]om[] will hate me for the rest of her life if they find out we made [the victim] to[sic] lie about you raping her[.] I wish I never told to[sic] say those things against you." However, Carrie asserted that she was sure that appellant had sexually abused the victim because appellant had done similar things to her.

During cross-examination, Carrie testified that after the victim made these allegations against appellant, she, appellant, and the younger children, including the victim, left Nashville, intending to go to Mexico so that appellant could avoid legal proceedings and so that she could be with appellant. Carrie conceded that in the

-8-

beginning of the legal proceedings against appellant, she attempted to protect appellant. Carrie asserted that the letter entered by appellant was not a statement that she had told the victim to lie but rather an explanation that her mother would hate her if she now said that she had asked the victim to make false allegations. During re-direct examination, Carrie explained that when she, appellant, and the younger children left to go to Mexico, they drove around for a few days. However, after Carrie asked the victim if she felt safe and the victim responded that she would be okay as long as appellant stayed in bed with Carrie and did not get in the victim's bed, Carrie realized that she could not go to Mexico with appellant. The next day the group returned home.

Socorro Moreno Torres, appellant's mother, testified that during part of appellant's and Carrie's marriage, the family lived with her. She asserted that appellant loved Carrie's children and that he treated all four of the younger children the same. Ms. Torres explained that sometimes Carrie's older children stayed in her home as well. Ms. Torres stated that after the older children arrived, appellant and Carrie began arguing. Ms. Torres asked appellant and Carrie to leave her home due to Carrie's older children's behavior. Ms. Torres explained that at some point, appellant moved back into her home without the rest of the family. She asserted that appellant was very upset because the children were not with him. Ms. Torres described the incident that occurred on Halloween 2011, stating that she was inside her home when she heard children crying outside. Ms. Torres went outside and saw Carrie grabbing appellant's head. When Ms. Torres attempted to remove the children, Carrie pushed Ms. Torres, and Ms. Torres fell to the ground. Ms. Torres stated that she saw one of Carrie's sons punching appellant. Ms. Torres had no further memory of the incident because she fainted and had to be taken to the hospital. Ms. Torres testified that Carrie told her that if appellant ever left Carrie, she was going to "get even with him."

Appellant testified in his own defense that he met Carrie while they were working at Krystal. They were married, and Carrie later gave birth to two children, one of whom was appellant's biological child. Appellant admitted that after Carrie's older children came to live with him and Carrie, he would lock the doors to some of the rooms but asserted that sometimes it was an attempt to gain privacy so that he could rest and other times it was to keep the younger children from being exposed to bad language and inappropriate content that Carrie's older sons were viewing electronically. Appellant explained that due to Carrie's older sons' behavior, numerous arguments ensued between appellant and Carrie and between appellant and Carrie's sons. Appellant stated that Carrie and two of her sons threatened to kill him on multiple occasions. Appellant explained that after he moved to his mother's house and Carrie and her children moved to her mother's house, he spent the night with Carrie at a motel and then in the morning, told Carrie that he wanted to end their relationship. In response, Carrie threatened to call the police and tell them that appellant had raped her. Carrie also told appellant that he was either going to be "hers or nobody else's." Appellant asserted that shortly thereafter,

Carrie called him asking for money, but when he told her that he was busy, Carrie called him a rapist and told him the victim had made allegations against him.

Appellant described the incident that occurred on Halloween 2011, stating that Carrie arrived at his mother's house demanding that he give her money and that he leave with her. Appellant explained that after Carrie had already hit him, Carrie threatened to kill his family if he did not comply with her demands and that when Carrie started walking towards his mother, he grabbed Carrie to stop her. Appellant testified that Nicolas intervened in the struggle, forcing appellant to the ground. After the fight calmed, appellant left with Carrie because he was concerned for his family's welfare. Appellant asserted that Carrie continued to make threats against his family and that after they took Carrie's children to her mother's home, Carrie threatened to have appellant's citizenship papers revoked. Appellant responded that as long as he did not do "anything bad," she could not interfere with his citizenship. Appellant testified that Carrie replied, "'Well, just watch [your] a**.'"

Appellant testified that the victim was lying during her testimony and that he would never hurt her. Appellant asserted that he did not favor the victim and that he tried to spend time with all of the children. Appellant agreed that he sometimes slept on the floor and that sometimes the victim also slept on the floor. Appellant stated that after Carrie's older sons moved in with them, due to the size of their apartments and the number of occupants, some of the children always had to sleep in his and Carrie's room. Appellant testified that he had given all of the younger children baths, including the victim, but that he never locked the door. Appellant also said that the incident in the bathroom with the milk was untrue and that he did not drink milk. Appellant asserted that the other allegations were also untrue.

During cross-examination, appellant admitted that he did not tell the investigating detectives about some of the specific allegations of Carrie's sons' bad behavior that he alleged at trial. Appellant agreed that he believed Carrie made up the sexual abuse allegations because he refused to give her money; however, he admitted that he did not tell that information to the detectives. Appellant asserted that initially he believed that Carrie's sons had persuaded the victim to make false allegations but that after receiving Carrie's letter in jail, he believed that Carrie was responsible for the false allegations. Appellant stated that he did not sleep with the victim in the floor as the victim described but that he slept in the bed with his wife.

After considering the evidence presented, the jury found appellant guilty of all six counts of aggravated sexual battery. The trial court sentenced appellant to ten years for each conviction, aligning the sentences concurrently except that Count One and Count Two were aligned consecutively, for a total effective sentence of twenty years. Appellant now challenges his convictions and sentences.

## II. Analysis

Appellant argues that: (1) the evidence was insufficient to support his convictions; (2) the State erroneously asked the victim leading questions about material facts of the case; and (3) the trial court erred in determining the length and alignment of his sentences. The State responds that the evidence was sufficient to support appellant's convictions, that the trial court properly allowed the State to ask leading questions during the victim's testimony, and that the trial court properly sentenced appellant.

## A. Sufficiency of the Evidence

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Aggravated sexual battery is defined, in part, as the "unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances: . . . (4) The victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a). Sexual contact is defined as the "the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's [or] the defendant's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id.* § 39-13-501(6). Aggravated sexual battery is a class B felony. *Id.* § 39-13-504(b).

The State relied on six instances of conduct to support appellant's aggravated sexual battery convictions. Viewing the evidence in the light most favorable to the State, we will recount each incident in the order elected by the State.

- The victim testified that appellant and the victim were lying on the bedroom floor of their apartment and that the defendant turned her to face him and began pushing his clothed genitalia against the victim's clothed genitalia "really hard." The victim explained that appellant was moving his body during this encounter.

- The victim testified that appellant put her hand on his unclothed penis, left his hand resting over her hand, and counted to ten or twenty while making her hand "go up and down." The victim stated that during this occurrence, she felt "something wet" while her hand was on appellant's genitalia. Ms. Howlett also testified that during the victim's interview at Our Kids Center, the victim stated that appellant had put her hand on his penis and "moved it back and forth."

- The victim explained that she awoke with her hand in appellant's pants touching appellant's penis, and the victim felt "something wet."

- The victim testified that appellant retrieved a glass of milk and then took the victim to the bathroom, locking the door after they had entered. Appellant then sat on the toilet, pulled down his pants, drank some of his milk, and then moved his hand "up and down" on his "private." Appellant then grabbed the victim's hand and "[did] the same thing and milk came out of his private." The victim explained that she had to wash her hands afterward to remove the substance. Nicholas also said that he remembered appellant locking the bathroom door while appellant and the victim were inside.

- The victim remembered appellant asking her to touch his testicles while they were in the bedroom of the apartment. Ms. Howlett also testified that during the victim's interview at Our Kids Center, the victim reported that appellant made her

-12-

"squeeze" appellant's testicles while appellant held his penis.

- The victim recounted an incident in the living room of the apartment in which appellant lay on the couch behind the victim and removed her pants and underwear. Appellant then touch the "outside" of the victim's genitalia with the tips of his fingers.

This information was sufficient for a reasonable jury to determine that there was intimate contact between the victim and appellant. The victim was six to seven years old when she reported these incidents, which satisfies the aggravating circumstance that the victim be under thirteen years of age when the contact occurred.

Appellant alleges that the victim's uncorroborated testimony regarding these incidents was insufficient to support his convictions and that there was insufficient proof to show that the touching was for the purpose of sexual arousal or gratification. However, the law does not require that a minor victim's testimony be corroborated to support a conviction. *State v. Smith*, 42 S.W.3d 101, 106 (Tenn. Crim. App. 2000) (stating that a twelve-year-old victim's testimony regarding incidents of aggravated sexual battery need not be corroborated). Furthermore, there was sufficient evidence of sexual arousal or gratification. The victim testified that during each incident, appellant was either moving his genitalia against her, that she felt "something wet" during the incidents of intimate contact, that "milk" came out of appellant's private, or that appellant was touching her unclothed genitalia while lying on the couch. Regarding the first incident in which the victim and appellant were clothed, their clothed state does not negate that the contact was for the purpose of sexual arousal and gratification under the circumstances of the contact. *See id.* at 106 (finding sufficient evidence of sexual arousal and gratification even though the victim and appellant were clothed during the contact). Based on this information, a reasonable jury could infer that the sexual contact was for the purpose of sexual arousal or gratification. Therefore, after viewing the evidence in the light most favorable to the State, a reasonable jury could find the essential elements of aggravated sexual battery were proven beyond a reasonable doubt.

## B. Leading Questions

Appellant also challenges the State's use of leading questions while questioning the eight-year-old victim. Specifically, appellant challenges the following colloquy that took place after the victim had testified about appellant pressing his private area against her private area while both parties were clothed:

Q: Okay. Was there another time that something happened on the floor in that room that you can tell us about?

A: Umm, I know there is something, but I can't remember.

Q: Was there a time on the floor in that room when --

. . . .

Q: Was there a time on the floor in that room when, you told us that he touched your body, your private with his private, was there a time on the floor in that room when you, when he wanted you to touch his private with your hand?

A: Yes.

Q: Can you tell us what you remember about that?

A: Can I write it down?

Q: Yes, you can.

. . . .

[Defense counsel objected to the form of the question, and the trial court overruled the objection. The trial court allowed defense counsel to lodge a standing objection to any further leading questions.]

A: First he would grab my hand and then he would put my hand on his private and then he would count to 10 or 20.

Tennessee Rule of Evidence 611(c)(1) states, "Leading questions should not be used on direct examination of a witness except as may be necessary to develop the witness's testimony." However, it is well-settled law that leading questions may be utilized during the direct examination of a child victim of sexual abuse. *Swafford v. State*, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975); *State v. Timonty P. Guilfoy*, No. M2012-00600-CCA-R3-CD, 2013 WL 1965996, at *11 (Tenn. Crim. App. May 13, 2013) (citations omitted). "The propriety, scope, manner and control of examination of witnesses is within the trial court's discretion and will not be interfered with in the absence of an abuse of discretion." *State v. Harris*, 839 S.W.2d 54, 72 (Tenn. 1992) (citations omitted).

The victim was six years old, almost seven, when she initially told someone about the sexual abuse, and she was eight years old at the time of trial. We note that even from a cold transcript, it is clear that the victim was having difficulty testifying about the

-14-

details of her encounters with appellant due to memory lapses, nervousness, and embarrassment. We also note that the leading questions did not unduly prejudice appellant because after the questions, the victim agreed that such encounters occurred and then added further detail about the incidents from her own memory. *See State v. William Dearry*, No. 03C01-9612-CC-00462, 1998 WL 47946, at *10-11 (Tenn. Crim. App. Feb. 6, 1998) (upholding a prosecutor's question asking the victim, "[D]id you touch him with your mouth somewhere?"); *State v. Craig Allen Lewis*, No. 01C01-9307-CC-00232, 1995 WL 10509, at *7 (Tenn. Crim. App. Jan. 12, 1995) (upholding leading questions to an eight-year-old victim even when all questions were leading and the victim's responses were mostly one or two words). Due to the victim's age and the circumstances, we conclude that the trial court did not abuse its discretion in allowing the State to use leading questions during the victim's direct examination.

## C. Sentencing

Appellant also argues that the trial court erred in: (1) applying the sentencing enhancement factor that the victim's personal injuries were particularly great; (2) failing to consider any mitigating circumstances, and (3) aligning two of appellant's sentences consecutively. The State responds that the trial court properly sentenced appellant.

## 1. Facts from Sentencing Hearing

At the sentencing hearing, appellant's presentencing report and the victim impact statement were admitted into evidence. Appellant also entered multiple letters regarding his character into evidence.

Angela, the victim's maternal grandmother, testified that since the victim reported appellant's sexual abuse, the victim had become "real sensitive to things, especially if you corrected her for anything or if mom corrected her, she was real easy to tune up and cry." After noticing this sensitivity and in preparation for possible testimony at trial, Angela helped enroll the victim in counseling. The victim attended counseling for a year and a half, and Angela opined that counseling had helped the victim. Angela testified that she expected the victim to need further counseling in the future. During cross-examination, Angela testified that the victim's sensitivity began before the victim's mother moved out of Angela's home, leaving the victim with Angela, and persisted after her mother had moved out.

Daniel Diaz Moreno, appellant's brother, testified that he and appellant worked together about ninety percent of the time. Mr. Moreno testified that at work appellant was considered to be responsible and a good worker. Regarding appellant's family, Mr. Moreno asserted that appellant was patient and non-argumentative. Mr. Moreno described appellant as very attentive to the children, explaining that appellant always

cared for the children and treated them all the same. Mr. Moreno stated that even after the victim made these allegations, appellant continued to work, explaining that appellant wanted to join the Army.

Inez Palacios Galan, appellant's sister-in-law, testified that appellant always took care of Carrie's children and treated all of the children the same. Ms. Galan asserted that appellant was a hard worker. Ms. Galan asked the judge to consider the least restrictive punishment for appellant.

Appellant testified he grew up in Monterey, Mexico, and came to the United States when he was fourteen years old. Appellant had lived in Nashville, Tennessee, since 1999. Appellant explained that he did not attend school because he had to work but that he later received his GED. Appellant asserted that he wanted to become an electrical engineer and that he read books and worked toward that goal. Appellant also stated that he wanted to join the Army and had tried to enlist multiple times; however, due to his citizenship status and situation, he was unable to join. Appellant stated that he was fluent in English and Spanish. Appellant asserted that he had never used alcohol, tobacco, or illegal drugs, even though he had been exposed to those things. Appellant explained that he became a United States permanent resident in 2010. Appellant admitted that he had been arrested "a couple of times" for driving without a license and that he had one conviction for driving without a license. However, after appellant obtained permanent residency, he obtained a driver's license. Appellant explained that due to this felony conviction, he would most likely have his citizenship status revoked and be deported. Appellant agreed that he was willing to fulfill the requirements of the Sex Offender Registry and Lifetime Community Supervision after his release from prison. Appellant apologized for what the victim was going through.

Following the presentation of this evidence, the trial court applied two enhancement factors — that the personal injuries to the victim were particularly great, Tenn. Code Ann. § 40-35-114(6), and that appellant abused a position of public or private trust in committing the crimes, *Id.* § 40-35-114(14) — and concluded that none of the mitigating circumstances were applicable. The trial court also determined that consecutive sentencing was appropriate. The trial court sentenced appellant to ten years at 100% release eligibility for each conviction of aggravated sexual battery and aligned two of the convictions consecutively, for a total effective sentence of twenty years.

2. Standard of Review

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5)

evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id*. § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id*. § 40-35-210(e). The weighing of mitigating and enhancing factors is left to the sound discretion of the trial court. *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Mark Moore*, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter*, 254 S.W.3d at 345 (citing *State v. Devin Banks*, No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected*, 271 S.W.3d 90 (Tenn. 2008)).

When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). If a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination. *Id.* at 709. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. *See Carter*, 254 S.W.3d at 346. The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

### 3. Enhancement and Mitigating Factors

Appellant argues that the trial court inappropriately applied the enhancement factor that the personal injuries inflicted upon the victim were particularly great and that the trial court erred in not applying any mitigating circumstances.

In analyzing the challenged enhancement factor, the trial court stated:

> The Court finds that the testimony of the victim's grandmother, as well as the victim impact statement, support the application of this factor. [Angela] testified that the victim has not been the same since these offenses, and that the victim has undergone and will have to continue to undergo psychological treatment. The victim also stated in the victim impact statement that she feels angry, scared and sad, and that this ordeal has affected her relationships with men. However, the Court also acknowledges that no expert testimony was presented as to the victim's psychological injuries in comparison to those of other victims of sexual battery. While this type of testimony is not required, it would aid the Court in determining whether the injuries inflicted upon the victim were "particularly great." See State v. Arnett, 49 S.W.3d 250, 260 (Tenn. 2001) ("[A]pplication of this factor is appropriate where there is specific and objective evidence demonstrating how the victim's mental injury is more serious or more severe than that which normally results from this offense.") Therefore, the Court will consider this factor, but will place more weight on the third enhancement factor discussed below.

We agree with the trial court's analysis that while there was some evidence that the victim's injuries were particularly great, the evidence was unclear without additional expert testimony. However, even if the application of this enhancement factor was error as appellant asserts, the trial court also properly applied the enhancement factor that appellant abused his position of trust as the victim's stepfather to perpetrate the offenses. The trial court also placed greater weight on this properly applied enhancement factor. Regarding the mitigating circumstances, the trial court stated that it considered the evidence presented and concluded that none of the mitigating circumstances were applicable. As stated above, even if a trial court misapplies an enhancing or mitigating factor in passing sentence, said error will not remove the presumption of reasonableness from its sentencing determination as long as the sentence is within range and otherwise complies with the sentencing guidelines. *Bise*, 380 S.W.3d at 709. Therefore, because the trial court properly considered the evidence offered by the parties, stated on the record what enhancement and mitigating factors were considered, and gave appellant a within range sentence, the trial court did not abuse its discretion in enhancing appellant's sentence.

## 4. Consecutive Sentencing

Appellant also argues that the trial court improperly aligned two of appellant's convictions consecutively. Prior to 2013, on appellate review of sentence alignment issues, courts employed the abuse of discretion standard of review. *See State v. Hastings,* 25 S.W.3d 178, 181 (Tenn. Crim. App. 1999). Our supreme court has since extended the standard of review enunciated in *State v. Bise*, abuse of discretion with a presumption of reasonableness, to consecutive sentencing determinations. *State v. Pollard,* 432 S.W.3d 851, 862 (Tenn. 2013); *State v. Bise,* 380 S.W.3d 682, 707 (Tenn. 2012) (modifying standard of review of within-range sentences to abuse of discretion with a presumption of reasonableness). Thus, the presumption of reasonableness gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." *Pollard*, 432 S.W.3d at 861. The procedure used by the trial courts in deciding sentence alignment is governed by Tennessee Code Annotated section 40-35-115, which lists the factors that are relevant to a trial court's sentencing decision. Imposition of consecutive sentences must be "justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102(1). The length of the resulting consecutive sentence must be "no greater than that deserved for the offense committed." *Id.* § 40-35-103(2). The court may order consecutive sentences if it finds by a preponderance of the evidence that one or more of seven statutory criteria exists, one of which is that:

> The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims[.]

*Id*. § 40-35-115(b)(5). The *Pollard* court reiterated that "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." *Pollard,* 432 S.W.3d at 862 (citing *State v. Dickson,* 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.*

In considering whether consecutive sentencing was appropriate, the trial court stated:

In this case, the Court finds that the Defendant was convicted of six (6) counts of aggravated sexual battery against the minor victim, whose age ranged from four (4) to six (6) years old when these offenses occurred. The Court finds that the Defendant used his relationship with the victim to perpetrate the offenses. The Court finds that the abuse lasted for an extended period of time; the proof indicated that the abuse was ongoing for two (2) years or more. The Court finds that the nature of the sexual acts was especially egregious given the very young age of the victim. The Court also finds based on the testimony of [Angela] and the victim's statements in the victim impact statement that the victim has suffered extensive residual and mental damage due to these offenses, and that she will be required to undergo treatment for some time. In light of all of these circumstances, the Court finds that consecutive sentences are appropriate in this case.

We cannot conclude that the trial court abused its discretion in this regard. There is sufficient evidence supporting the trial court's determination that consecutive sentencing was justified, and the trial court articulated its reasoning on the record. As such, the trial court did not abuse its discretion in aligning two of appellant's six convictions consecutively.

## CONCLUSION

Based on the parties' briefs, the record, and the applicable law, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE